UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SONIA E. VIDAL,

               Plaintiff,

      v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security
Administration,

              Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 14-416-SP

MEMORANDUM OPINION AND
ORDER

**I.**

**INTRODUCTION**

On January 28, 2014, plaintiff Sonia E. Vidal filed a complaint against defendant, the Commissioner of the Social Security Administration ("Commissioner"), seeking a review of a denial of a period of disability and disability insurance benefits ("DIB"). Both plaintiff and defendant have consented to proceed for all purposes before the assigned Magistrate Judge pursuant to 28 U.S.C. § 636(c). The court deems the matter suitable for adjudication without oral argument.

Plaintiff presents two issues for decision: (1) whether the Administrative Law Judge ("ALJ") properly rejected the opinion of treating physician Dr. Scott Steiglitz; and (2) whether the ALJ properly considered plaintiff's credibility. Memorandum in Support of Complaint ("P. Mem.") at 1-14; Memorandum in Support of Defendant's Answer ("D. Mem.") at 2-10.

Having carefully studied, inter alia, the parties' moving papers, the Administrative Record ("AR"), and the decision of the ALJ, the court concludes that, as detailed herein, the ALJ properly rejected Dr. Steiglitz's opinion and properly considered plaintiff's credibility. Consequently, this court affirms the decision of the Commissioner denying benefits.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who was forty-eight years old on her alleged disability onset date, has a college education and completed nursing school. AR at 55, 177. Her past relevant work was as an assembler and a certified nursing assistant. *Id.* at 48.

On July 6, 2010, plaintiff filed an application for a period of disability and DIB, due to panic attacks, diabetes, anxiety disorder, depression, and memory loss. *Id.* at 172, 176. The Commissioner denied plaintiff's application initially and upon reconsideration, after which she filed a request for a hearing. *Id.* at 65-75, 78-79.

On May 21, 2012, plaintiff, represented by counsel, appeared and testified at a hearing before the ALJ. *Id.* at 36-50. The ALJ also heard testimony from a vocational expert. *Id*. at 47-50. On September 26, 2012, the ALJ denied plaintiff's claim for benefits. *Id.* at 14-30.

Applying the well-known five-step sequential evaluation process, the ALJ found, at step one, that plaintiff had not engaged in substantial gainful activity since August 14, 2009, the alleged onset date. *Id.* at 28.

At step two, the ALJ found that plaintiff suffered from the following severe impairments: depressive disorder, not otherwise specified; general anxiety disorder; history of alcohol abuse; and diabetes mellitus. *Id*.

At step three, the ALJ found that plaintiff's impairments, whether individually or in combination, did not meet or medically equal one of the listed impairments set forth in 20 C.F.R. part 404, Subpart P, Appendix 1 (the "Listings"). *Id.*

The ALJ then assessed plaintiff's residual functional capacity ("RFC"),[1] and determined that plaintiff had the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations, plaintiff could: understand, remember, and carry out simple instructions; respond appropriately to supervisors, co-workers, and customary work pressures; deal with changes in a routine work setting; and use judgment. *Id*. The ALJ also determined that plaintiff should not work with the public, and should work with objects rather than people to complete job tasks. *Id.*

The ALJ found, at step four, that plaintiff was capable of performing her past relevant work as an assembler. *Id.* at 30. Consequently, the ALJ concluded that plaintiff did not suffer from a disability as defined by the Social Security Act. *Id.*

Plaintiff filed a timely request for review of the ALJ's decision, which was denied by the Appeals Council. *Id.* at 1-3. The ALJ's decision stands as the final decision of the Commissioner.

---

[1]   Residual functional capacity is what a claimant can do despite existing exertional and nonexertional limitations. *Cooper v. Sullivan*, 880 F.2d 1152, 1155-56 n.5-7 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.

## STANDARD OF REVIEW

This court is empowered to review decisions by the Commissioner to deny benefits.  42 U.S.C. § 405(g).  The findings and decision of the Social Security Administration must be upheld if they are free of legal error and supported by substantial evidence.  *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001) (as amended).  But if the court determines that the ALJ's findings are based on legal error or are not supported by substantial evidence in the record, the court may reject the findings and set aside the decision to deny benefits.  *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001).

"Substantial evidence is more than a mere scintilla, but less than a preponderance."  *Aukland*, 257 F.3d at 1035.  Substantial evidence is such "relevant evidence which a reasonable person might accept as adequate to support a conclusion."  *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *Mayes*, 276 F.3d at 459.  To determine whether substantial evidence supports the ALJ's finding, the reviewing court must review the administrative record as a whole, "weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion."  *Mayes*, 276 F.3d at 459.  The ALJ's decision "'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'"  *Aukland*, 257 F.3d at 1035 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)).  If the evidence can reasonably support either affirming or reversing the ALJ's decision, the reviewing court "'may not substitute its judgment for that of the ALJ.'"  *Id.* (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)).

1

**IV.**

2

**DISCUSSION**

3    **A.    The ALJ Properly Considered the Opinion of Plaintiff's Treating**

4    **Physician**

5         Plaintiff contends that the ALJ improperly rejected the opinion of her

6    treating physician, Dr. Scott Steiglitz.  P. Mem. at 1-10.  Specifically, petitioner

7    argues that the reasons the ALJ provided for rejecting his opinion were not

8    specific and legitimate and supported by substantial evidence.  *Id.*

9         In determining whether a claimant has a medically determinable

10   impairment, among the evidence the ALJ considers is medical evidence.  20

11   C.F.R. § 404.1527(b).  In evaluating medical opinions, the regulations distinguish

12   among three types of physicians:  (1) treating physicians; (2) examining

13   physicians; and (3) non-examining physicians.  20 C.F.R. § 404.1527(c), (e);

14   *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  "Generally, a treating

15   physician's opinion carries more weight than an examining physician's, and an

16   examining physician's opinion carries more weight than a reviewing physician's."

17   *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R.

18   § 404.1527(c)(1)-(2).  The opinion of the treating physician is generally given the

19   greatest weight because the treating physician is employed to cure and has a

20   greater opportunity to understand and observe a claimant.  *Smolen v. Chater*, 80

21   F.3d 1273, 1285 (9th Cir. 1996); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th

22   Cir. 1989).

23         Nevertheless, the ALJ is not bound by the opinion of the treating physician.

24   *Smolen*, 80 F.3d at 1285.  If a treating physician's opinion is uncontradicted, the

25   ALJ must provide clear and convincing reasons for giving it less weight.  *Lester*,

26   81 F.3d at 830.  If the treating physician's opinion is contradicted by other

27   opinions, the ALJ must provide specific and legitimate reasons supported by

28

1  substantial evidence for rejecting it.  *Id.*  Likewise, the ALJ must provide specific

2  and legitimate reasons supported by substantial evidence in rejecting the

3  contradicted opinions of examining physicians.  *Id.* at 830-31.  The opinion of a

4  non-examining physician, standing alone, cannot constitute substantial evidence.

5  *Widmark v. Barnhart*, 454 F.3d 1063, 1067 n.2 (9th Cir. 2006); *Morgan v.*

6  *Comm'r*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d

7  813, 818 n.7 (9th Cir. 1993).

8        **1.**  **<u>Medical History</u>**

9        **<u>Dr. David R. Jensen</u>**

10        Dr. David R. Jenson, an internist, treated plaintiff from at least July 2008

11  through approximately December 2009.  *See* AR at 255, 265.  Dr. Jenson

12  diagnosed plaintiff with depression and anxiety.  *See id.* at 257.  Dr. Jenson

13  initially treated plaintiff with Lexapro, but following an anxiety attack in August

14  2009, Dr. Jenson also prescribed Abilify and Lorazepam.  *See id.* at 256-59.

15  Plaintiff did not consistently adhere to her treatment plan.  Plaintiff informed the

16  hospital and Dr. Jenson that she had stopped taking Lexapro prior to the anxiety

17  attack.  *See id.* at 247, 285.  Following the anxiety attack, plaintiff continued to be

18  non-compliant.[2]  *See id.* at 256.

19        **<u>Dr.  Scott Steiglitz</u>**

20        Dr. Steiglitz, a psychiatrist, treated plaintiff from approximately March

21  2010 through at least January 2012.  *See id.* at 372, 505.  During the initial

22  examination, plaintiff reported that, over a period of several years, she had, among

23  other things, a depressed mood, decreased concentration, feeling of hopelessness,

24  fear of dying, and periods of intense fear.  *Id.* at 372-73.  Plaintiff reported that she

25  _____

26      [2]  After plaintiff switched physicians, she reported to her new physician that
Dr. Jensen also prescribed Cymbalta but she stopped taking it.  AR at 375.  Dr.

27  Jenson's treatment notes do not contain any mention of Cymbalta.  *See id.* at 255-

28  88.

1  was taking Citalopram and Lorazepam, was compliant with her treatment plan,

2  and continued to experience persistent anxiety and depressive symptoms while on

3  the medication. *See id*. Dr. Steiglitz diagnosed plaintiff with depression. *Id.* at

4  373. At subsequent exams, plaintiff frequently reported persistent or increasing

5  depression. *See, e.g., id.* at 365, 401, 519. Despite her depression, during her

6  mental status examinations, plaintiff presented as alert and oriented with normal

7  dress, behavior, speech, and thought, and almost always without suicidal ideation.

8  *See, e.g.*, *id*. at 516, 519, 523, 688. On some occasions, plaintiff presented with

9  depressed or anxious affect or mood (*see id.* at 371, 532, 545, 577), but plaintiff

10 also regularly presented with normal mood and affect. *See id.* at 516, 519, 523,

11 688.

12      After reporting suicidal ideation in July 2010, Dr. Steiglitz assigned plaintiff

13 a global assessment of functioning ("GAF") score of 51-41,[3] and referred plaintiff

14 to a hospital for a voluntary psychiatric hold and electronic convulsive treatment

15 ("ECT"). *See id.* at 300-03, 625. After plaintiff received her first ECT treatment,

16 plaintiff's mood appeared to improve but she decided against any further ECT

17 treatments. *See id.* at 290-91, 619. Dr. Steiglitz continued to treat plaintiff with

18 medication. *See, e.g.*, *id*. at 400, 545.

19      On June 2, 2011, Dr. Steiglitz completed a form opinion titled Medical

20 Source Statement of Ability to Do Work-Related Activities (Mental). *Id*. at 447-

21 49. In the form, Dr. Steiglitz opined that plaintiff had marked limitations in her

22 ability to understand, remember, and carry out short, simple instructions and to

23 make judgments on simple work-related decisions, and she had extreme

24

25    [3] A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation,

26 severe obsessional rituals, frequent shoplifting) *or* any serious impairment in
    social, occupational, or school functioning (e.g., no friends, unable to keep a job,

27 cannot work)." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of

28 Mental Disorders 34 (4th Ed. 2000) ("DSM") (emphasis in original).

limitations in her ability to understand, remember, and carry out detailed instructions. *Id.* at 447. Dr. Steiglitz further opined that plaintiff would also have extreme limitations in her ability to interact appropriately with the public, supervisors, and co-workers, and respond appropriately to work pressures and changes in a routine work setting. *Id*. at 448. To support his opinion, Dr. Steiglitz explained that plaintiff was suffering from severe depression that was not responding to medication and that her refusal to leave her house affected her activities of daily living. *Id.*

## Dr. Stephen Simonian

On January 11, 2011, Dr. Simonian, a psychiatrist, examined plaintiff. *Id*. at 403-08. Dr. Simonian was unable to review plaintiff's medical records because none were available to him. *See id.* at 403. During the examination, Dr. Simonian observed that plaintiff had: normal speech; coherent thinking; intact memory, comprehension, and abstract thinking; and an anxious and at times sad mood. *Id*. at 406. Dr. Simonian diagnosed plaintiff with depressive disorder and generalized anxiety disorder. *Id.* at 407. Dr. Simonian opined that plaintiff had no limitations in her ability: to understand, remember, and carry out simple one or two-step job instructions; to do detailed and complex instructions; to maintain concentration and attention for a period of time; to maintain regular attendance in the work place and perform work activities on a consistent basis; and to perform work activities without special or additional supervision. *Id.* at 407-08. Dr. Simonian opined that plaintiff would have moderate limitations in her ability to relate and interact with supervisors and to adapt to the stresses common to a normal work environment. *Id* at 407.

## Other Physicians

The ALJ also discussed other physicians' treatment notes or examinations in his decision. Dr. Mary Kathleen Igo initially examined plaintiff when she changed

insurers. *Id.* at 375-81. Dr. Igo reviewed plaintiff's history and discussed her symptoms, which included a depressed mood, decreased concentration, excessive anxiety, and intense fear. *See id*. at 376. Dr. Igo diagnosed plaintiff with major depression, generalized anxiety disorder, post traumatic stress disorder, and panic disorder, and assigned a GAF score of 60.[4] *Id.* at 380.

During the voluntary psychiatric hold in July 2010, three psychiatrists examined plaintiff. Dr. Michael Frankel observed that plaintiff was alert, oriented, cognitively intact, but had a depressed mood. *Id*. at 302. Dr. Mahboob Ali Makhani observed that plaintiff was anxious, had slow speech, and depressed mood. *Id.* at 298. Dr. George McAuley observed that plaintiff was alert, oriented, and verbal, but had a flat affect indicating depression. *Id.* at 292.

Dr. D. Funkenstein, a State Agency psychiatrist, reviewed plaintiff's medical records and opined that plaintiff had general anxiety disorder. *Id.* at 414. Dr. Funkenstein further opined that, in the absence of alcohol and with medication compliance, plaintiff's mental impairment would not be severe. *Id*. at 422.

## 2. The ALJ's Findings

The ALJ concluded that plaintiff had the severe impairments of depressive disorder, not otherwise specified, general anxiety disorder, a history of alcohol abuse, and diabetes mellitus. *Id.* at 28. Consequently, the ALJ determined that plaintiff had non-exertional limitations in that plaintiff should not work with the public and not work with other people to complete the job tasks, but could: understand, remember and carry out simple instructions; respond appropriately to supervisors, co-workers, and customary work pressures; deal with changes in a routine work setting; and use judgment. *Id.* In reaching those determinations, the ALJ gave weight to the opinion of Dr. Simonian, weight to the opinion of Dr.

---

[4]   A GAF score of 51-60 indicates "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." DSM.

1  Funkenstein only with regards to his opinion about plaintiff's concentration,

2  persistence, and pace, and no weight to Dr. Steiglitz's opinion.  *See id.* at 23-25.

3  The ALJ gave no weight to Dr. Steiglitz's opinion because the opinion was

4  inconsistent with plaintiff's treatment record, plaintiff was non-compliant with her

5  treatment plan, and the form opinion relied on plaintiff's subjective complaints.[5]

6  *See id.*  The ALJ's reasons for rejecting Dr. Steiglitz's opinion were specific and

7  legitimate and supported by substantial evidence.

8          The first reason the ALJ gave for rejecting Dr. Steiglitz's opinion was that it

9  was not supported by the objective findings in the treatment notes.  *Id.* at 22, 24.

10  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (the incongruity

11  between a physician's opinion and treatment records is a specific and legitimate

12  reason for rejected the opinion); *Batson v. Comm'r*, 359 F.3d 1190, 1195 (9th Cir.

13  2004) (one factor for discounting a physician's opinion is lack of supporting

14  objective evidence).  The ALJ correctly notes that the treatment notes contain few

15  objective findings indicating marked limitations.  Other than the one visit where

16  she exhibited suicidal ideation in July 2010, the treatment notes indicate that

17  plaintiff was alert, oriented and had normal behavior, speech and thought content

18  at all visits.  *See, e.g.*, AR at 516, 519, 523, 688.  Although plaintiff sometimes

19  had a depressed mood or affect, she also regularly had a normal mood and affect.

20  *Compare id.* at 371, 516, 519, 532.  Other physicians, including Dr. Simonian,

21  observed the same findings regarding plaintiff's mental status.  *See id.* at 353, 406,

22  536, 564.  Plaintiff correctly recognizes that the treatment notes contain symptoms

23  supporting Dr. Steiglitz's limitations such as feeling of worthlessness, fatigue, and

24  fears, but those were her *subjective* complaints and as discussed below, plaintiff's

25  _____

26          [5]  Plaintiff argues that the ALJ discounted Dr. Steiglitz's opinion, in part,
   because, in light of her past alcoholism, he should have and failed to monitor
27  plaintiff's alcohol intake.  P. Mem. at 8.  Although the ALJ remarked on Dr.
   Steiglitz's failure, it was not a basis for rejecting his opinion.  *See* AR at 24.
28

credibility was unreliable. *See, e.g., id*. at 371; *see also Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (an ALJ may disregard an opinion premised on subjective complaints that have been properly discounted).

Second, the ALJ rejected Dr. Steiglitz's opinion on the ground that plaintiff was non-compliant with her treatment plan. *See id.* at 22, 24. In the form opinion, Dr. Steiglitz wrote that his assessments of plaintiff's limitations were based on the fact that plaintiff's depression was not responding to medication. *See id.* at 448; *see also id.* at 300. In other words, the primary basis for Dr. Steiglitz's opinion regarding the severity of plaintiff's limitations was that it could not be managed by medication. But the premise was wrong. Plaintiff was not, at any point during her treatment with either Dr. Jenson or Dr. Steiglitz, fully compliant with her treatment plan. Indeed, every two or three months, plaintiff would admit that she had not been taking her medications as prescribed. *See id.* at 247, 256, 353, 363, 368, 375-77, 515, 519, 577. At one point, plaintiff admitted to never having been compliant. *See id.* at 368. It is unclear to the extent that Dr. Steiglitz was aware of plaintiff's compliance issue when he completed the form opinion, because at that point she had only told Dr. Steiglitz once that she was not taking her medications. *See id.* at 577. In fact, plaintiff once told a therapist that she was not compliant with her treatment but then, on the same day, told Dr. Steiglitz that she was compliant with her treatment plan. *See id.* at 363, 365.

Nevertheless, whether Dr. Steiglitz was aware or should have been aware is irrelevant. Dr. Steiglitz's opined limitations were based on plaintiff's subjective complaints, complaints that were not reliable in light of not only the fact that she did not adhere to her treatment plan but also that she lied to Dr. Steiglitz about her compliance. Because Dr. Steiglitz's opinion was premised on the belief that plaintiff's impairment was not improving with medication when, in fact, plaintiff was not taking her medication consistently, the opinion was not reliable. As such,

1    plaintiff's failure to adhere to her treatment plan was a specific and legitimate

2    reason for rejecting Dr. Steiglitz's opinion.

3    The ALJ's final reason for rejecting Dr. Steiglitz's opinion was specific and

4    legitimate.  The ALJ stated that he did not give Dr. Steiglitz's form opinion any

5    weight because it relied "solely on [plaintiff's] subjective allegations and self-

6    assessed limitations because [plaintiff's] statements [were] not entirely reliable or

7    credible."  P. Mem. at 25.  As discussed above, the treatment notes did not contain

8    any objective findings to support such marked limitations and the opinion was

9    based on the incorrect assumption the medication was not helping.  The limitations

10   appear to be based on plaintiff's unreliable subjective complaints.  An ALJ may

11   reject a physician's opinion if that opinion is based on the subjective testimony

12   and reporting of a claimant whose credibility the ALJ discounted.  *See Andrews v.*

13   *Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995) (diagnosis based on the self-reporting

14   of an unreliable person may be discounted).  As discussed below, the ALJ properly

15   discounted plaintiff's credibility.  The ALJ thus properly rejected the form

16   opinion.

17   Accordingly, the ALJ cited specific and legitimate reasons supported by

18   substantial evidence for rejecting the opinion of Dr. Steiglitz.

19   **B.**    **The ALJ Provided Clear and Convincing Reasons for Discounting**

20          **Plaintiff's Credibility**

21   Plaintiff contends that the ALJ failed to make a proper credibility finding.

22   P. Mem. at 1, 10-14.  Specifically, plaintiff alleges that the ALJ's reasons for

23   finding her less credible were not clear and convincing.  *Id.*  The court disagrees.

24   The ALJ must make specific credibility findings, supported by the record.

25   Social Security Ruling 96-7p.  To determine whether testimony concerning

26   symptoms is credible, the ALJ engages in a two-step analysis.  *Lingenfelter v.*

27   *Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  First, the ALJ must determine

28   whether a claimant produced objective medical evidence of an underlying

impairment "'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  Second, if there is no evidence of malingering, an "ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  *Smolen*, 80 F.3d at 1281; *Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003).  The ALJ may consider several factors in weighing a claimant's credibility, including:  (1) ordinary techniques of credibility evaluation such as a claimant's reputation for lying; (2) the failure to seek treatment or follow a prescribed course of treatment; and (3) a claimant's daily activities.  *Tommasetti*, 533 F.3d at 1039; *Bunnell*, 947 F.2d at 346-47.

At the first step, although the ALJ did not expressly state so, the ALJ presumably found that plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged.  *See* AR at 28-30.  At the second step, because the ALJ did not find any evidence of malingering, the ALJ was required to provide clear and convincing reasons for discounting plaintiff's credibility.  Here, the ALJ discounted plaintiff's credibility because:  (1) her alleged symptoms were inconsistent with her treatment records; (2) she was non-compliant with her treatment plan; (3) she made inconsistent statements about her English language abilities; and (4) her daily activities were inconsistent with her alleged symptoms.  *Id*.

### 1. Treatment Records

First, the ALJ found that plaintiff's alleged symptoms were inconsistent with her treatment records and the objective evidence.  *Id.* at 29; *see Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (lack of corroborative objective medicine may be one factor in evaluating credibility).  As discussed above, the treatment notes from all of plaintiff's treating and examining physicians were bereft of objective findings to support marked limitations.   Plaintiff was alert,

1  oriented and had normal behavior, speech and thought content at each visit.  *See,*

2  *e.g.,* AR at 403-08, 516, 519, 523, 688.  Plaintiff often exhibited a depressed mood

3  or affect, but a depressed mood or affect is insufficient to support the alleged

4  severity of the symptoms.  The remainder of the treatment notes consist of

5  plaintiff's subjective complaints.  Although lack of objective medical evidence

6  alone is not a clear and convincing reason to discount plaintiff's credibility, here it

7  is one of several reasons properly given.  *See Burch v. Barnhart*, 400 F.3d 676,

8  681 (9th Cir. 2005) (lack of objective medical evidence is a factor the ALJ can

9  consider in a credibility analysis).

10      **2.    Non-Compliance**

11      The second reason the ALJ cited for finding plaintiff less credible was her

12  failure to comply with her treatment plan.  AR at 29.  Specifically, plaintiff was

13  not consistently taking her medications.  *Id.*; *see also Orn v. Astrue*, 495 F.3d 625,

14  638 (9th Cir. 2007) (the failure to seek treatment for complaints is "a basis for

15  finding the complaint unjustified or exaggerated"); *Tommasetti*, 533 F.3d at 1039

16  (failure to follow a prescribed course of treatment weighs against a claimant's

17  credibility).  Plaintiff's  assertion that she was only non-compliant on two

18  occasions is belied by the record.  *See* Reply in Support of Complaint at 5-6.  As

19  discussed above it appears plaintiff was not compliant for more than a few months

20  at a time.  *See* AR at 247, 256, 353, 363, 368, 375-77, 515, 519, 577.  Indeed, in

21  June 2010, plaintiff admitted that she had never been compliant with her

22  treatment.  *Id*. at 368.  Moreover, plaintiff was not forthright with Dr. Steiglitz

23  about her failure to comply with the treatment plan.  Although she reported her

24  non-compliance to Dr. Steiglitz on three occasions, she also lied to him on at least

25  one occasion.  *See id.* at 363, 365, 515, 519, 577.

26      Further, as the ALJ found, plaintiff had no justification for her non-

27  compliance.  *Id*. at 23; *see Orn*, 495 F.3d at 638 (failure to seek treatment may be a

28  basis for an adverse credibility finding unless there was a good reason for not

doing so).  From the record, it appears that plaintiff's mental impairments did not play a role in her failure to adhere to her treatment plan.  Indeed, even if plaintiff had a poor memory, she stated that her family reminded her to take her medications.  AR at 195.  At the hearing, petitioner testified that she experienced side effects from her medications such as fatigue.  *Id.* at 47.  But the treatment notes reflected that plaintiff consistently told her physicians that she experienced no major side effects from her medications.  *See, e.g.*, *id.* at 651.

### 3.   Inconsistent Testimony Regarding English Language Abilities

Third, the ALJ discounted plaintiff's credibility on the basis that she made inconsistent statements about her English language abilities.  AR at 29.  The ALJ noted that plaintiff was "trying to appear more limited that she actually" was.  *Id.*

The ALJ correctly noted that plaintiff made inconsistent statements about her English language abilities.  In a disability report completed after July 2010, plaintiff indicated that she could not speak, understand, read, or write more than her name in English.  *See id.* at 175, 183.  Plaintiff also requested an interpreter for her administrative hearing.  *Id.* at 40.  But at the hearing, plaintiff testified that she was able to speak and understand a simple conversation in English, and could read "sometimes" and write "a little bit" in English also.  *Id*. at 39-40.  Moreover, plaintiff's treatment records do not indicate that she has any problems communicating in English.  None of plaintiff's physicians indicated that she required an interpreter or had trouble communicating.[6]  Indeed, Dr. McAuley noted that plaintiff spoke English and was verbal.  *See id*. at 289.  And on a report of contact form, the Agency representative noted that plaintiff spoke "near perfect English and fully understood" her responses.  *Id*. at 207.

Thus, there was substantial evidence supporting the ALJ's finding that

---

[6]   In contrast, a therapist notated in the treatment records that she provided services in Spanish.

plaintiff made inconsistent statements about her English language abilities.

### 4.   Activities of Daily Living

The ALJ cited the inconsistency between plaintiff's daily activities and her alleged limitations as his final reason for finding less credible.  *Id.* at 30. Specifically, the ALJ noted that plaintiff, inter alia, dropped off and picked up her daughter from school, prepared and cooked meals for one to two hours a day, did household chores three times a week for four hours at a time, did laundry twice a week for two hours each time, read, drove short distances, went grocery shopping, took care of the finances, talked on the phone, and went to church.  *Id.*; *see also id.* at 193-200.

Inconsistency between a claimant's alleged symptoms and her daily activities may be a clear and convincing reason to find a claimant less credible. *Tommasetti*, 533 F.3d at 1039; *Bunnell*, 947 F.2d at 346.  But "the mere fact a [claimant] has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability."  *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).  A claimant does not need to be "utterly incapacitated."  *Fair*, 885 F.2d at 603 (9th Cir. 1989).

Here, plaintiff's daily activities appear to be transferable to a work setting and also appear inconsistent with her alleged marked or extreme limitations with regard to her ability, inter alia, to:  understand, remember, and carry out short, simple instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors, and co-workers; and respond appropriately to changes in a routine work setting. AR at 447-48.  Plaintiff may have mild or moderate limitations, but her ability to perform these daily activities is inconsistent with marked or extreme limitations.

In sum, the ALJ provided multiple clear and convincing reasons supported by substantial evidence for discounting plaintiff's credibility.  Accordingly, the

ALJ did not err in this regard.

## V.

## CONCLUSION

IT IS THEREFORE ORDERED that Judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits, and dismissing the complaint with prejudice.

DATED:  May 12, 2015

_____
SHERI PYM
United States Magistrate Judge

17